IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Karen S.,[1] | ) | Case No.: 1:20-1113-JD-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Kilolo Kijakazi,[2] Acting Commissioner of | ) | **ORDER** |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This social security matter is before the Court with the Report and Recommendation of United States Magistrate Judge Shiva V. Hodges ("Report and Recommendation") pursuant to Local Civil Rule 83.VII.02 (D.S.C.). The plaintiff, Karen S. ("Plaintiff" or "Karen"), brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her Disability Widow's Benefits ("DWB"). The Magistrate Judge issued her Report and Recommendation on January 7, 2021, concluding that Karen did not show that the Commissioner's findings of facts were not supported by the substantial evidence and the Commissioner applied the proper legal standards, and therefore, recommending that the Commissioner's decision be affirmed. (DE 21.)

On January 14, 2021, Karen filed objections to the Report and Recommendation. (DE 23.) Karen's objection alleges that the Magistrate improperly accorded "great weight" to two State Agency consultants who did not examine or treat Karen but concluded that Karen has the

---

[1]     The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2]     Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021; and therefore, he is substituted for Andrew Saul as the defendant in this suit.

1

residual functional capacity ("RFC") to perform light work, which includes lifting, carrying, pushing, and pulling 10 pounds frequently and 20 pounds occasionally during an eight hour work period and standing and walking up to six hours out of the eight hour work day. (DE 23.) Further, Karen contends the Report, like the Administrative Law Judge, did not consider the record as a whole to include more than twenty impairments suffered by Karen and the impact upon her functional abilities to perform light work. (DE 23.)

Thereafter, on January 28, 2021, the Commissioner filed a response to Karen's objections. (DE 25.) Having thoroughly considered the parties' submissions and the applicable law, the Court adopts the Report and Recommendation and affirms the Commissioner.

**BACKGROUND**

The Report and Recommendation sets forth the relevant facts and legal standards, which this Court incorporates herein without a full recitation. (DE 21.) However, as a condensed background relating to the objections raised by Karen, the Court provides this summary. Karen was 53 years old at the time of the October 3, 2018 hearing. (DE 14-1, Tr. p. 50.) She has no past relevant work ("PRW"). (DE 14-1, Tr. p. 51.) She alleges she has been unable to work since May 1, 2011. (DE 14-1, Tr. p. 385, 393.) Without a full recitation of the medical records in the record, the Court notes records dating back to December 27, 2007. At that time, magnetic resonance imaging ("MRI") of Karen's cervical spine showed: (1) mild multilevel degenerative disc disease; (2) broad posterior disc protrusion at the C3-4 level causing effacement of the anterior subarachnoid space and possible abutment of the anterior margin spinal cord; (3) posterior focal central disc protrusion at the C4-5 level causing indentation of the anterior thecal sac without spinal cord or nerve root compromise apparent; (4) subtle canal and bilateral neural foraminal encroachment at the C5-6 level due to bulging annulus with or without underlying

superimposed uncovertebral joint hypertrophy causing impression upon the anterior sac without spinal cord compromise apparent; (5) broad posterior central/right paracentral disc protrusion at the C6-7 level without spinal cord or nerve root compromise apparent; and (6) loss of the lordotic curvature. (DE 14-1, Tr., p. 1048-49.)

An MRI of Plaintiff's lumbar spine performed on the same day indicated the following:

> Advanced degenerative disc disease at the L5–S1 level with subtle increase in the size of the broad posterior central disc protrusion causing obliteration of the anterior epidural fat and abutment of the left S1 nerve root. There has been no overall interval change in the size of the underlying superimposed posterior right paracentral disc extrusion at this level causing persistent impression/impingement of the descending right S1 nerve root. Again seen is subtle neural foraminal encroachment on the right without exiting right L5 nerve root compromise apparent.

(DE 14-1, Tr. p. 1050.) A surgery pathology report dated January 15, 2008, indicates lumbar disc material consistent with herniated nucleus pulposus.[3] (DE 14-1, Tr. p. 72.)

Thereafter, on May 25, 2011, Karen went to Spartanburg Regional Healthcare System after being injured in a car accident, at which time she complained of mild midline neck pain. (DE 14-1, Tr. p. 985.) X-rays of Karen's cervical spine showed disc space narrowing and marginal osteophytes at C5-6 but were negative for fracture. She was diagnosed with cervical strain and discharged. (DE 14-1, Tr. p. 985.) On June 24, 2011, Karen presented to George S. Bailes, M.D., and indicated she was recently injured in a car accident. She complained of shoulder pain, pigmented skin lesions, sinusitis, and edema. (DE 14-1, Tr. 985.)

---

[3] This record was among records submitted after the ALJ's decision, which include other records related to: urinary frequency, kidneys, diabetes, colonoscopy, hemorrhoid, sleep disturbance, apnea, ear pain, heart palpitations, rectal bleeding, constipation, diarrhea, sinus pressure, cough, post-nasal drip, shortness of breath, hypertension, colorectal surgery to remove perianal skin tags and external hemorrhoids, depression, joint pain in her hands, ureteral stones. (DE 14-1, Tr. pp. 72, 75-76, 81, 98, 119-20, 138, 140, 175, 176, 179, 181, 198, 199-200, 201-02, 203-05, 223, 224, 226, 227, 250-51, 257, 258, 261, 277-78, 298-99, 999, 1000, 1001, 1003, 1005, 1007, 1008-09.)

On November 19, 2013, Karen complained of pain in her spine, dyspnea, cough, and not feeling well. (DE 14-1, Tr. p. 650.) On December 6, 2013, Karen had a followed-up appointment, at which the provider adjusted her medications and referred her to an ear, nose, and throat specialist. (DE 14-1, Tr. p. 650.) On January 30, 2015, Karen complained of a one-month history of abdominal and back pain, and the provider noted extreme tenderness over her left kidney. On June 30, 2014, Karen complained of upper respiratory symptoms and pain and swelling in her right shoulder, elbow, and wrist after having sustained a fall in the shower ten days prior and noted she had also sustained a fall three weeks prior. (DE 14-1, Tr. p. 799.) Robert E. Jackson, M.D. ("Dr. Jackson") reviewed x-rays that were normal and observed full range of motion ("ROM") of the right elbow and wrist with tenderness and minor swelling and full ROM in the right shoulder with minor discomfort. Jackson recommended Karen treat the areas with an ice pack, Ace wrap, elevation, and Aleve. (DE 14-1, Tr. p. 799.)

On July 27, 2016, x-rays of Karen's lumbar spine showed: (1) generalized osteopenia; (2) moderate-to-marked degenerative disc disease at the L5-S1 level with subtle bony spinal encroachment; (3) multilevel facet arthropathy; (4) subtle posterior dis space narrowing at the L4-5 level; (5) rotatory levoscoliosis of the lower lumbar spine; and (6) presumed subcentimeter renal calculus in the left kidney. (DE 14-1, Tr. p. 772.) At that appointment, the provider stated Karen needed to be seen by a provider on a semi-urgent basis given her hypertension and mild-to-moderate shortness of breath. (DE 14-1, Tr. p. 776.)

During this timeframe beginning in 2011, Karen also presented to medical professionals for other complaints, to include skin lesions, sinusitis edema (DE 14-1, Tr. p. 825); anxiety, upper respiratory infection (Id.); urinary tract infection, night sweats, upper respiratory infection, anxiety, and panic attacks (DE 14-1, Tr. 821); chest congestion, shortness of breath, abdominal

4

pain, nausea, vomiting, cough, and difficulty breathing (DE 14-1, Tr. 816); difficulty swallowing (DE 14-1, Tr. 830); sore throat and chills (DE 14-1, Tr. 813).

Throughout 2012 to 2017, Karen also consistently complained of upper respiratory infection ("URI") and allergies (DE 14-1, Tr. 812); chest pressure, although an electrocardiogram was normal (DE 14-1, Tr. 809); chest pain, shortness of breath, and elevated heart rate (DE 14-1, Tr. 664); anxiety, depression, asthma, neck swelling, allergies, and kidney stones (DE 14-1, Tr. 657); wrist arthritis (DE 14-1, Tr. 652); abnormal thyroid (DE 14-1, TR. 609); sore throat, chest burning, and shortness of breath (DE 14-1, Tr. 807); difficulty swallowing (DE 14-1, Tr. 648); hyperthyroidism, nasal congestion, cough, and wheezing (DE 14-1, Tr. 805) ; difficulty breathing following allergy injections (DE 14-1, Tr. 944); upper respiratory congestion and drainage, sore throat, swollen lymph nodes, low-grade anxiety, panic attacks, and intermittent back spasms (DE 14-1, Tr. 803); anemia (DE 14-1, Tr. 509), colon polyps (DE 14-1, Tr. 924); high blood pressure, persistent cough and throat clearing, gastroesophageal reflux disease ("GERD") (DE 14-1, Tr. 582, 574); chest pain (DE 14-1, Tr. 579), although a myocardial perfusion scan produced normal results (DE 14-1, Tr. 619) and a gallbladder ultrasound, EKG, and troponin levels were all normal (DE 14-1, Tr. 733), but a subsequent abdominal ultrasound showed a non-obstructing left renal stone and hepatic steatosis (DE 14-1, Tr. 717); fatigue, depression, and anxiety, hot flashes, night sweats, chronic gastritis, constipation and diarrhea (DE 14-1, Tr. 796); vaginal discharge, pain with urination (DE 14-1, Tr. 846, 849); intermittent rectal bleeding, bloating, nausea, left-sided pain, and occasional fecal incontinence (DE 14-1, Tr. 834).

On August 19, 2016, state agency psychological consultant Xanthia Harkness, Ph.D. ("Dr. Harkness") reviewed Karen's medical records and considered listings 12.04 for affective disorders and 12.06 for anxiety-related disorders. (DE 14-1, Tr. pp. 306-07.) She assessed no

5

restriction of activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (DE 14-1, Tr. pp. 306-07.) On November 1, 2016, state agency medical consultant Seham El-Ibiary ("Dr. El-Ibiary") reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally stoop; frequently balance, kneel, crouch, crawl, and climb ladders/ropes/scaffolds; and avoid concentrated exposure to hazards, fumes, odors, dust, gases, poor ventilation, etc. (DE 14-1, Tr. pp. 308-10.)

On March 22, 2017, a second state agency psychological consultant, Silvie Ward, Ph.D. ("Dr. Ward") reviewed the record, considered Listings 12.04 and 12.06 and assessed no difficulties in Plaintiff's abilities to adapt or manage oneself and mild difficulties in her abilities to understand, remember, or apply information, interact with others, and concentrate, persist, or maintain pace. (DE 14-1, Tr. pp. 322-23.) On March 23, 2017, a second state agency medical consultant, Dina Nabors, M.D. ("Dr. Nabors") assessed the same physical RFC as Dr. El-Ibiary.

On September 19, 2018, x-rays of Karen's cervical spine showed increased adipose tissue in the anterior submental neck and cervical spondylosis.[4] (DE 14-1, Tr. pp. 250-41.)

## LEGAL STANDARD

The magistrate judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. Mathews v. Weber, 423 U.S. 261 (1976). The Court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection

---

[4] This record is also part of records submitted after the ALJ hearing. See n. 3.

has been made, and may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge. 28 U.S.C. § 636(b)(l). However, de novo review is unnecessary when a party makes general and conclusory objections without directing a court's attention to a specific error in the Magistrate Judge's proposed findings. Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). In the absence of a specific objection, the court reviews the report and recommendation only for clear error. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (citation omitted); see also Tyler v. Wates, 84 F. App'x 289, 290 (4th Cir. 2003) ("A general objection to the entirety of the magistrate judge's report is tantamount to a failure to object.")

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. Section 205(g) of the Act provides, "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ."[5] 42 U.S.C. § 405(g). The court must uphold the Commissioner's decision as long as it was supported by substantial evidence and reached through the application of the correct legal standard. Johnson v. Barnhart, 434 F.3d 650 (4th Cir. 2005). This standard precludes a de novo review of the factual circumstances that substitutes the court's findings for those of the Commissioner. Vitek v. Finch, 438 F.2d 1157 (4th Cir. 1971). "From this it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." Flack v. Cohen, 413 F.2d 278, 279 (4th Cir. 1969). "[T]he courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound foundation for the

---

[5] "Substantial evidence has been defined innumerable times as more than a scintilla, but less than a preponderance." Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). "It means—and means only— "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019).

[Commissioner's] findings, and that his conclusion is rational." Vitek, 438 F.2d at 1157-58. However, the court does not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the ALJ." Johnson, 434 F.3d at 653. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Id.

## DISCUSSION

Karen objects to the Report on the same grounds that she argues the ALJ erred in assessing an RFC for light work and in failing to assess additional restrictions. (DE 18, pp. 11–15.) First, she maintains that the Court should not adopt the ALJ's finding because she "accorded 'great weight' to the evaluations of the non-examining, non-treating state agency consultants. However, Drs. El-Ibiary and Nabors assessed Plaintiff's RFC as one for light work with additional non-exertional restrictions. (DE 14-1, Tr. pp. 308–10, 324–27.) The ALJ noted the state agency medical consultants had "an understanding of Social Security Administration disability programs and evidentiary requirements" and their opinions were "supported by the objective medical evidence" and were "consistent with the record as a whole." (DE 14-1, Tr. p. 40.) Although Plaintiff claims Drs. El-Ibiary and Nabors' opinions included "no analysis of the medical evidence of record, no reason, and no specific findings" (DE 20, p. 8), her assertion lacks merit. Dr. El-Ibiary specifically referenced findings from Dr. Parke's exam, October 2016 pulmonary function testing, and July 2016 x-rays of the lumbar spine and addressed evidence as to diabetes, skin conditions, and respiratory, musculoskeletal, and gastrointestinal impairments. (DE 14-1, Tr. pp. 309–10.) Dr. Nabors cited the same evidence, as well as Plaintiff's new allegations and progress notes from her December 30, 2016, visit with Dr. Jackson. (DE 14-1, Tr. p. 326.) There is substantial evidence in the record to support the ALJ's favorable consideration of Drs. El-Ibiary's

and Nabors's opinions because they were consistent with the other evidence of record. (DE 14-1, Tr. p. 40.) Because "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive," the Court is bound to uphold the Commissioner's decision because it was supported by substantial evidence in the record. 42 U.S.C. § 405(g).

Next, Karen objects on the basis that the ALJ did not consider the record as a whole. The Court notes the Report's thorough and comprehensive recitation and analysis of the record. Karen contends the evidence shows she cannot meet the demands of light work on a regular and sustained basis. (DE 18, pp. 12–13.) She cites diagnostic imaging that showed severe impairment to her lumbar and cervical spines, signs and symptoms related to right shoulder impairment, and abnormal pulmonary function testing, and claims these impairments would prevent her from meeting the lifting, carrying, pushing, and pulling demands of light work. (DE 18, pp. 13–15.) She further contends her urinary impairments would require she use the bathroom frequently throughout a workday, resulting in her being off-task for excessive periods. (DE 18, p. 15.) She maintains the ALJ relied on isolated evidence from the record that was unfavorable to her, failed to consider the entire record in context, improperly credited the state agency consultants' opinions, and did not consider the combined effect of her impairments. (DE 20, pp. 6–9.)

The ALJ acknowledged the imaging reports Plaintiff references, her history of back surgery, and her testimony as to constant, radiating back and neck pain. (DE 14-1, Tr. pp. 28, 29–30, 37.) She addressed the evidence as follows:

> Imaging studies showing significant lumbar degenerative disc disease from 2007 are remote to the claimant's present application and her alleged onset of disability date. X-rays of the lumbar spine obtained in 2016 show significant degenerative disc disease and osteopenia. However, there are no accompanying clinical records to show the objective signs, the severity of the claimant's symptoms or the kinds of limitations that the claimant alleged.

(DE 14-1, Tr. p. 39.) The ALJ further explained:

9

> The medical evidence of record showed that the claimant seldom complained of back or neck pain and there were no descriptions of radicular pain or paresthesias in the upper or lower extremities. It did not appear that musculoskeletal pain/complaints were a focus of medical care throughout the medical evidence of record, except for occasions of acute injury. Where noted, the claimant had a normal gait and she ambulated normally.

(DE 14-1, Tr. p. 39.)  Thus, the Report correctly points to how the ALJ addressed Plaintiff's allegations and explains that the record supported no greater restrictions than those the ALJ included in the RFC assessment for "light work with additional postural and environmental restrictions." (DE 14-1, Tr. p. 39.)

Plaintiff claims that May 2011 and June 2015 injuries to her right shoulder "prevent[] her from meeting the reaching, pushing and pulling, and lifting and carrying and exertional demands of light work." (DE 18, p. 14.)   The ALJ acknowledged the May 2011 and June 2015 injuries. (DE 14-1, Tr. pp. 30, 36.)  The ALJ  noted Plaintiff "still had generalized tenderness" upon follow up with Dr. Bailes on June 24, 2011, and that Dr. Bailes "prescribed Mobic for her shoulder pain." (DE 14-1, Tr. p. 30.)  She also cited Plaintiff's June 2015 complaint of injury to her right shoulder and findings of "some tenderness and swelling," but "full range of motion of the right shoulder." (DE 14-1, Tr. p. 36.)  As Plaintiff's complaints of right shoulder impairment were related to acute injuries and the record reflects no ongoing complaints that would suggest functional impairment, the ALJ reasonably declined to include restrictions as to Plaintiff's use of her right shoulder in the RFC assessment.

Plaintiff also maintains pulmonary problems would further reduce her RFC. (DE 18, pp. 14–15.) The ALJ acknowledged Plaintiff's testimony that she would become short of breath after walking for three minutes, had to sit after mopping a room because of shortness of breath, had "terrible asthma and allergies," received allergy shots every two weeks, used inhaler medication,

was unable to exercise, and avoided exposure to perfumes and pets. (DE 14-1, Tr. pp. 27–29.) However, she found that Plaintiff's statements were not entirely consistent with the medical evidence and other evidence in the record. (DE 14-1, Tr. p. 29.) The ALJ discussed Plaintiff's multiple presentations for shortness of breath, congestion, allergic rhinitis, URIs, dyspnea, and related complaints between June 2011 and June 2018 and diagnoses of bronchial asthma and allergic rhinitis. (DE 14-1, Tr. pp. 30–39.) The ALJ found the following:

> The claimant's primary presentations for care involved asthma and respiratory complaints. While the claimant did have some restrictive findings on some pulmonary function tests, the findings did not meet listing level severity and the claimant did not require three or more multiple hospitalizations within a 12- month period due to asthma or any other respiratory causes. The more recent medical evidence of record tends to show that the claimant's asthma was stable.

(DE 14-1, Tr. p. 40.) This explanation demonstrates the ALJ's consideration of the relevant evidence and how the ALJ accounted for Plaintiff's respiratory symptoms in assessing an RFC for light work with occasional exposure to respiratory irritants. The conclusion is supported by a record reflecting intermittent presentations for respiratory symptoms between 2011 and 2013, multiple acute exacerbations between January and August 2014, and intermittent complaints of symptoms thereafter.

In sum, the ALJ "accounted for claimant's back and neck pain as well as her obesity and diabetes, by limiting her to light work with additional postural and environmental restrictions." (DE 14-1, Tr. p. 39.) She indicated "[t]he RFC accounts for claimant's respiratory complaints by limiting her to light work and occasional exposure to respiratory irritants." (Id.) She noted Plaintiff's GERD, hyperthyroidism and hypertension were "managed with medications," cardiac workups were normal, and there "was no evidence that the claimant had any serious health complications due to hypertension." (Id.) The ALJ found that Plaintiff's "symptoms of depression and anxiety were controlled with medications." (Id.) The ALJ considered Dr. Jackson's note that

11

Plaintiff had "significant stress associated with caring for her elderly mother with dementia" as "suggest[ing] a greater degree of functionality than the claimant alleged." (Id.) The ALJ concluded that "[t]aken together, the evidence tends to show that the claimant is capable of performing light work, consistent with the residual functional capacity." (Id.)

The medical evidence of record also showed that the claimant seldom complained of back or neck pain and there were no descriptions of radicular pain or paresthesias in the upper or lower extremities. It did not appear that musculoskeletal pain/complaints were a focus of medical care throughout the medical evidence of record, except for occasions of acute injury. Where noted, the claimant had a normal gait and she ambulated normally. (DE 14-1, Tr. p. 39.) Thus, the ALJ addressed Plaintiff's allegations, but explained that the record supported no greater restrictions than those included in the RFC assessment for "light work with additional postural and environmental restrictions." (DE 14-1, Tr. p. 39.)

A thorough review of the record reveals the ALJ and the Report properly considered all the relevant evidence, evaluated Plaintiff's ability to perform relevant functions on a regular and continuing basis, explained how the evidence supported each conclusion, and reconciled all conflicting evidence in assessing the RFC, and the decision is supported by substantial evidence. Given that the Court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether the decision is supported as a matter of fact and law, the Court has no basis to reverse or modify the ALJ's decision.

## CONCLUSION

For the foregoing reasons, the Court adopts the Report and Recommendation and affirms the Commissioner.

13

**AND IT IS SO ORDERED.**

_____
Joseph Dawson, III
United States District Judge

August 23, 2021
Greenville, South Carolina

13